UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| ZEIDY M. PONCE CONEJO, | Case No. 2:14-cv-01557-MMD-PAL |
| Plaintiff, | |
| v. | **REPORT OF FINDINGS AND RECOMMENDATION** |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security,[1] | (Mot. To Remand – ECF No. 18)<br>(Cross-Mot. to Affirm – ECF No. 21) |
| Defendant. | |

This matter involves Plaintiff Zeidy M. Ponce Conejo's appeal and request for judicial review of the Acting Commissioner of Social Security, Defendant Nancy A. Berryhill's final decision denying her claim for disability insurance benefits under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–33.

## BACKGROUND

### I.    PROCEDURAL HISTORY

Plaintiff Zeidy M. Ponce Conejo ("Conejo") filed an application for disability benefits on December 30, 2010, alleging onset of disability on July 20, 2010, the last day she worked as a medical aesthetician. AR 10, 45, 169.[2] She was 38 years old when she applied. AR 31. In her application, Ms. Conejo claimed she was unable to work because of cervical fusion, a titanium

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to the Federal Rules of Civil Procedure and the Social Security Act, the court therefore substitutes Nancy A. Berryhill for Carolyn W. Colvin as the defendant in this suit. *See* Fed. R. Civ. P. 25(d) (allowing the automatic substitution of a successor to a public officer who is a party to an action but ceases to hold office while the action is pending); 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

[2] AR refers to the Administrative Record (ECF No. 17-1), a certified copy of which was delivered to the undersigned upon the Commissioner's filing of her Answer.

disc in her neck, pain in her left arm, constant pain in her spine, and depression. AR 168. A motor vehicle accident in March 2008 caused her to undergo a cervical fusion and plate placement in 2009. AR 15. A second accident in February 2010 necessitated a second and third cervical surgery in August 2010 and November 2011. AR 19–20. Conejo alleged she became disabled and stopped working shortly before the second surgery. AR 168. The Social Security Administration (the "Agency") denied her application initially and on reconsideration. AR 86–89; 95–97.

An administrative law judge ("ALJ") held a hearing on May 9, 2013, where Ms. Conejo appeared with counsel. AR 40–60. The ALJ accepted testimony from Conejo, AR 42–57, and a vocational expert, AR 57–60. During the hearing, counsel asserted that Conejo was disabled based on her back pain, cervical fusion, depression, and a recently diagnosed seizure disorder. AR 43. In a decision dated June 12, 2013, the ALJ found that she was not disabled. AR 10–33. The ALJ found that, despite her allegations of debilitating pain, Conejo's testimony revealed no restrictions in her daily activity and the medical records cast doubt on the severity of her symptoms.

Ms. Conejo requested review of the ALJ's decision by the Appeals Council, but the ALJ's decision became final when the Appeals Council denied review on August 5, 2014. AR 1–5. On September 23, 2014, she filed Complaint (ECF No. 1) in federal court, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). The Commissioner filed her Answer (ECF No. 14) on March 3, 2015. Conejo filed a Motion to Remand (ECF No. 18), and the Commissioner filed a Response and Cross-Motion to Affirm (ECF Nos. 21, 22). The court has considered the Motion, the Response and Cross-Motion, and the Reply (ECF No. 23).

## II.    THE ADMINISTRATIVE RECORD

### A.    Neck and Back Pain

In March 2008, Ms. Conejo was involved in a motor vehicle accident. AR 305–08. According to Mary Angela Thomas, M.D., an EMG/nerve conduction study of her upper extremities in June 2009 revealed essentially normal findings and no findings suggestive of C6-7 radiculopathy, despite a "slightly decreased ulnar motor nerve amplitude on the left." AR 248–49. However, she failed conservative care of her neck pain with radiculopathy, including chiropractic treatment, medication, nerve root blocks, and injections. AR 241–65 (medical records

from Dr. Thomas); AR 562–64 (medical records from John B. Siegler, M.D.). Her injuries led to a cervical spinal surgery (fusion of C6-7 with decompression and reconstruction), which was performed by orthopedic surgeon, Mark Kabins, M.D., in August 2009. AR 17, 266–95. Conejo testified at the administrative hearing that she never felt well after the surgery and continued to experience neck pain, but she worked through the pain in order to pay bills. AR 48.

In February 2010, Ms. Conejo was involved in a second auto accident. AR 299–304. She presented to the St. Rose Dominican Hospital emergency room the following day reporting stiffness of her neck and upper back and discomfort in her right wrist. AR 299. She was ambulatory with a normal gait and denied having any numbness, weakness, or tingling, distally. AR 299. She expressed concern that the second accident may have damaged the hardware in her neck from the cervical fusion surgery. *Id*. She was discharged from the emergency room with prescriptions for Motrin, Percocet, and Flexeril, and told to follow up with Dr. Kabins and her primary doctor. AR 300–301. She testified that the second accident worsened her neck pain and caused headaches. AR 49–50.

In April 2010, Ms. Conejo was treated by urologist, Helen Housley, M.D., for a recurrent urinary tract infection (UTI). AR 309–12. On a review of systems, Conejo reported symptoms including joint or back pain, steroid joint injections, weakness and numbness in her extremities, and radicular pain. AR 310. However, Dr. Housley's examination revealed largely normal findings, even though the second accident occurred about six weeks prior. AR 310–11, 541–44. Conejo's spine was straight with a normal range of motion and there was no CVA or spinal tenderness to percussion. AR 310. She demonstrated a normal gait. *Id*. Her head was atraumatic and she was in no acute distress. AR 311. Additionally, she reported having recently traveled outside of the country to Costa Rica. AR 310.

Ms. Conejo underwent a second surgery with Dr. Kabins in August 2010. AR 50, 316. In January 2011, the surgeon noted that she had residual neck discomfort and a restricted range of neck motion. AR 380. The following month, radiographs of her cervical spine demonstrated that the instrumentation was in place, spinal alignment was well maintained, and there was no evidence of loosening, migration or failure. AR 379. Although she had residual spasms, neck pain, and

headaches, she had no new motor sensor deficits or new objective findings of abnormality. AR 378–79. Dr. Kabins deemed Conejo "neurologically stable." AR 379. Over the next few visits, Kabins stated that she had "made excellent progress," was "markedly improved from her preoperative status" overall, and she was "happy with the outcome" of the second surgery. AR 377–78.

In March 2011, Dr. Siegler, a board-certified physical medicine and rehabilitation specialist, noted that Conejo was status post a second cervical surgery with improvement of her radicular pain. AR 359. Her upper extremity strength was recorded as 5/5; however, she was still experiencing symptoms in her neck. *Id*. Dr. Siegler administered trigger point injections and prescribed pain medications including Oxycodone, Percocet, Zanaflex, and Lidocaine patches. AR 360.

Over the next few visits to Dr. Siegler, Ms. Conejo reported anxiety and gastrointestinal symptoms. AR 354, 356, 472, 476. She indicated that her primary doctor placed her on Zoloft and Xanax. AR 476; *see also* AR 370 (progress notes of Seema Sood, M.D.). Dr. Siegler adjusted her medications periodically and administered injections regularly. AR 463, 465, 467, 473, 477. Conejo's August 2011 treatment notes indicate that a plane ride flared her pain, but the medication was helping. AR 464. In September 2011, Dr. Siegler noted that she was "stable on medications," and she reported that the medications were "helpful." AR 462. However, the following month she stated that her pain seemed to be "worsening with increasing upper extremity complaints." AR 460.

Ms. Conejo also reported increasing pain, paresthesia, and dysesthesia to Dr. Kabins in September 2011. AR 490. She had decreased sensation in her fingertips and the lateral aspects of her hands and arms. *Id*. Radiographs indicated to Dr. Kabins that her artificial disc at C5-6 "could be inferior, keel if loose." *Id*. The treatment notes state that "a radiolucency around this indicative of pseudoarthrosis or loosening of the endplate to the vertebral bodies that are fixed," and Dr. Kabins believed this was likely the cause of Conejo's symptomology. *Id*. Based on her ongoing symptoms and failure of conservative care, Dr. Kabins referred her for a myelogram, CT scan, and further EMG testing, and he noted she may be a candidate for revision surgery at C5-6. *Id*.

Ms. Conejo underwent a cervical myelogram in October 2011. AR 502–03. The findings indicated that her fusion hardware appeared "intact without evidence of loosening." AR 502. There was a straightening of the normal cervical lordosis, a mild disc bulge at C3-4, and a minimal disc bulge at C4-5. *Id.* There was no evidence of spinal canal or neuroforaminal stenosis. *Id.* The EMG/nerve conduction study of her bilateral upper extremities stated impressions that there was no electrodiagnostic evidence of cervical radiculopathy, brachial plexopathy, peripheral polyneuropathy. or left upper extremity entrapment neuropathy. AR 494. After reviewing these results, Dr. Kabins concluded that Conejo was an appropriate candidate for revision surgery that would "require complete removal, revision decompression and reconstruction." AR 489.

In a letter to Ms. Conejo's insurance company, dated October 26, 2011, Dr. Kabins stated that she had an "apparent failure of the inferior portion of the artificial disc." AR 492. There was "a radiolucency on the Prodisc-C keel which [wa]s attempted to be imbedded in C6." *Id.* The doctor opined that the radiolucency was "indicative of loosening." *Id.*; *see also* AR 493–94 (Kabins noting that "the artificial disc could be inferior, possibly loose"). Although the loosening and/or failure was difficult to definitively ascertain from the CT/myelogram, the plain radiographs displayed "clear evidence of collapse and failure" and Conejo had a "distinct worsening of her underlying clinical condition failing supportive care services and medications." AR 492. As such, she consented to revision surgery. *Id.*

A third cervical surgery was performed in November 2011. AR 424–35. Ms. Conejo experienced residual neck discomfort postoperatively but her treatment notes state that she was "markedly improved" overall from her preoperative status and was "happy with the outcome." AR 487. In January 2012, Dr. Kabins indicated that her "neck was stable," spinal alignment was well maintained, and there was "no evidence of loosening, migration or failure." AR 486. Dr. Kabins deemed Conejo "neurologically stable" in March 2012, and he instructed her to continue using an electrical bone stimulator and follow up with Dr. Siegler. *Id.* AR 485.

Shortly after the third surgery, Ms. Conejo reported new onset low back pain to Dr. Siegler and Dr. Kabins. AR 457, 486. She reported pain in her back and tailbone that radiated in her bilateral lower extremities. AR 485. She also reported difficulty standing, walking, and

ambulating. *Id.* Both Dr. Siegler and Dr. Kabins recommended an MRI of her lumbosacral spine as Conejo was tender in the lower back and had paresthesia in the lower extremities. AR 456, 486. Dr. Kabins noted that she was indicated for physical therapy. AR 485. Dr. Siegler also treated the lower back pain with epidural injections. AR 507.

In July 2012, Dr. Kabins' treatment notes state that Ms. Conejo was "taking a short hiatus to Costa Rica" and would return to his care in late August 2012. AR 556. Upon her return, Dr. Kabins indicated that she was "neurologically unchanged" but remained with significant pain in her back, hip, and radiating to her lower extremities. AR 555. As such, Kabins opined that she was a candidate for decompression and stabilization at L4-5, L5-S1. *Id.*

In late August 2012, Conejo reported to Dr. Siegler that some back pain had returned but not as severe as before the injections. AR 615. The following month she received an additional injection for lower back pain. AR 613, 623–24. Her treatment notes indicate that she was "going out of the country for a family emergency." AR 613. In October 2012, Dr. Siegler's treatment notes state that she had increasing pain in the low back and legs. AR 608. She remained with pain in her neck but that was "controlled with medication." *Id.*

Dr. Siegler performed a lumbar disc stimulation on Conejo in December 2012 pursuant to Dr. Kabin's recommendation. AR 554, 617–19. The discogram showed concordant pain at L4-5 and L5-S1. AR 606. Although she reported pain in the neck, the medications were "helpful." *Id.* Given the results of the discography, Dr. Kabins recommended surgery. AR 553, 603.

## B. Headaches and Seizures

During the administrative hearing, Ms. Conejo testified that she began having headaches after the second car accident in February 2010. AR 49; *see also* AR 519. She reported dizziness, lightheadedness, and vertigo to Dr. Kabins in November 2012. AR 554. She was referred to neurologist Jimmy John Novero, M.D. AR 514–37, 570–85.

During her initial visit with Dr. Novero, Conejo's chief complaint was dizziness. AR 531. The treatment notes indicate that she had been complaining of episodic dizziness for about two months and the symptoms were worsening with increased frequency. *Id.* She described a spinning sensation with occasional nausea, vomiting, and occipital headaches. *Id.* However, she reported

6

that two days prior to her appointment, she experienced numerous seizure episodes during which her whole body shook causing her to fall to the ground. *Id*. She may have experienced tongue biting, but there was no incontinence. *Id*. Ms. Conejo's son reported that she was confused but did not lose consciousness, and she did not look pale or sweaty. *Id*.

An MRI of Conejo's brain was normal. AR 529–30. She also underwent two electroencephalogram (EEG) studies. AR 522–24, 535–36. In December 2012, the EEG study was "grossly unremarkable except for the occasional suspicious left temporal sharp waves." AR 535. Dr. Novero requested further evaluation with a repeat sleep-deprived study. *Id*. The second study showed findings suggestive of interictal epileptiform activity. AR 522. Novero's impressions indicated that intermittent spikes could suggest a partial seizure disorder. *Id*.

In a December 2012 follow-up visit, Ms. Conejo described having good days and bad days with frequent headaches associated with nausea, dizziness, and light sensitivity. AR 525. Dr. Novero prescribed Zomig 5 mg tabs for her to take at the onset of a headache. AR 527. Conejo's symptoms were the same the following month, but she reported several more seizure incidents in which she "passed out." AR 574. Her son was present and she was "on the floor for about an hour." *Id*. The next day she experienced a similar event and "suddenly fell down after passing out." *Id*. Dr. Novero noted that he would write a letter to the DMV regarding a three-month driving restriction. AR 576. He prescribed her Topiramate and indicated that he would adjust the dose according to her response. *Id*.

Ms. Conejo brought a neighbor to her February 2013 neurology appointment. AR 518. She complained of "constant severe headaches." *Id*.; *see also* AR 553, 603 (reporting seizures to Drs. Kabins and Siegler in February 2013). The neighbor stated that Conejo was having at least two seizures a week. AR 518. The neighbor, who lived below Conejo, witnessed some of her seizures but also knew when she was having a seizure because she would " 'hear her fall on the floor'. *Id*. Dr. Novero prescribed Sumavel injections and continued the Topiramate. AR 520.

The following month, Ms. Conejo reported she was still experiencing recurrent seizures but they were lessening in frequency. AR 514. She still complained of headaches, occasionally severe, and migraines. *Id*. Dr. Novero instructed her to continue Topiramate and he prescribed

Zomig nasal spray and Depakote as "a second migraine preventative and anticonvulsant." AR 516.

In a seizure questionnaire completed in April 2013, Dr. Novero stated that he diagnosed Conejo with complex-partial seizures and migraines. AR 549; *see also* AR 519 (noting that she presented with "partial seizures (i.e. complex-partial seizures), with intermittent migraines"). He indicated that she loses consciousness and averages two seizures per week. AR 549. She did not always have a warning of an impending seizure. *Id*. She could not always take safety precautions when she felt a seizure coming on. *Id*. When asked to describe the degree to which having seizures interfered with her daily activities following a seizure, Dr. Novero stated that her seizures did not occur at a certain time and they may come on at any given time, posing a risk to her and her surroundings. AR 550. The neurologist further indicated that Conejo's postictal manifestations were confusion, exhaustion, irritability, and visual blurriness. *Id*.

## C.    Anxiety and Depression

In May 2011, Ms. Conejo completed registration forms with Harmony Healthcare to begin individual counseling sessions for mental health issues related to her physical conditions. AR 414. Depression, anxiety, and marital conflict were described as her primary issues during her first session in June 2011. AR 420. In an initial psychiatric assessment, Agapito Racoma, M.D., diagnosed panic disorder without agoraphobia and prescribed her Zoloft, Xanax, and Ambien at night for sleep. AR 423. Her global assessment of function (GAF) was rated at 65. *Id*. Conejo's medications were periodically adjusted, *see* AR 591, 595–96; however, she also reported benefit from the medications. AR 596.

Treatment notes from Ms. Conejo's counseling sessions through April 2013 repeatedly note that her problems were a combination of anxiety, depression, chronic pain, insomnia, headaches, and seizures. AR 415–40, 588–90, 592–94. In November 2011, a revised treatment plan documents Conejo's progress noting that she was "less depressed" and "less anxious." AR 421. Medication progress notes report no evidence of hallucinations, paranoia, delusional thoughts, or cognitive dysfunction. AR 422, 591, 595–96. The mental status examinations over numerous counseling sessions reported no evidence of psychosis or suicidal/homicidal ideation. AR 415–20, 588–90, 592, 594.

# DISCUSSION

## I.  APPLICABLE LAW

### A.    Judicial Review of Disability Determination

District courts review administrative decisions in social security benefits cases under 42 U.S.C. § 405(g).  *Akopyan v. Barnhart*, 296 F.3d 852, 854 (9th Cir. 2002).  The statute provides that after the Commissioner has held a hearing and rendered a final decision, a disability claimant may seek review of that decision by filing a civil lawsuit in a federal district court in the judicial district where the disability claimant lives.  42 U.S.C. § 405(g).  The statute also provides that the district court may enter, "upon the pleadings and transcripts of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  *Id.*

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g); *Ukolov v. Barnhart*, 420 F.3d 1002 (9th Cir. 2005).  But the Commissioner's findings may be set aside if they are based on legal error or not supported by substantial evidence.  *Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1052 (9th Cir. 2006); *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).  The Ninth Circuit defines substantial evidence as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995); *see also Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005).  In determining whether the Commissioner's findings are supported by substantial evidence, a court "must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence'."  *Ghanim v. Colvin*, 763 F.3d 1154, 1160 (9th Cir. 2014) (quoting *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012)).

Under the substantial evidence test, a court must uphold the Commissioner's findings if they are supported by inferences reasonably drawn from the record.  *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2003).  When the evidence will support more than one rational interpretation, a court must defer to the Commissioner's interpretation.  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).  Consequently, the issue before a court is not whether the

Commissioner could reasonably have reached a different conclusion, but whether the final decision is supported by substantial evidence.

It is incumbent upon an ALJ to make specific findings so that a court does not speculate as to the basis of the findings when determining if the Commissioner's decision is supported by substantial evidence. *See Burrell v. Colvin*, 775 F.3d 1133, 1140 (9th Cir. 2014). Mere cursory findings of fact without explicit statements about what portions of the evidence were accepted or rejected are not sufficient. *Lewin v. Schweiker*, 654 F.2d 631, 634 (9th Cir. 1981). An ALJ's findings should be comprehensive, analytical, and include a statement explaining the "factual foundations on which the ultimate factual conclusions are based." *Id. See also Vincent v. Heckler*, 739 F.2d 1393, 1394–95 (9th Cir. 1984) (an ALJ need not discuss all the evidence in the record, but must explain why significant probative evidence has been rejected).

### B. Disability Evaluation Process

A claimant has the initial burden of proving disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995). To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant must provide specific medical evidence to support his or her claim of disability. *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998). If a claimant establishes an inability to perform his or her prior work, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful work that exists in the national economy. *See Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012) (noting that a claimant bears the burden of proof until the final step in the evaluation process).

## II. THE ALJ'S DECISION

An ALJ follows a five-step sequential evaluation process in determining whether a claimant is disabled. 20 C.F.R. § 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). If at any step an ALJ makes a finding of disability or non-disability, no further evaluation is required. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003).

Here, the ALJ followed the five-step sequential evaluation process and issued an

unfavorable decision on June 12, 2013 (the "Decision"). AR 10–33. Ms. Conejo does not challenge the ALJ's findings at any particular step, but primarily asserts that the ALJ failed to articulate clear and convincing reasons for discounting her complaints. The parties stipulate that the ALJ fairly and accurately summarized the evidence and testimony of record, except as specifically addressed in their arguments.

## A. Step One

The first step of the disability evaluation requires an ALJ to determine whether the claimant is currently engaging in substantial gainful activity ("SGA"). 20 C.F.R. §§ 404.1520(b), 416.920(b). SGA is defined as work activity that is both substantial and gainful; it involves doing significant physical or mental activities, usually for pay or profit. 20 C.F.R. §§ 404.1572(a)–(b), 416.972(a)–(b). If the claimant is currently engaging in SGA, then a finding of not disabled is made. If the claimant is not engaging in SGA, then the analysis proceeds to the second step.

At step one in the Decision, the ALJ found that Ms. Conejo had not engaged in SGA since July 20, 2010, the alleged onset date. AR 12. Given her lack of SGA, the ALJ's analysis proceeded to the second step.

## B. Step Two

The second step of the disability evaluation addresses whether a claimant has a medically-determinable impairment that is severe or a combination of impairments that significantly limits him or her from performing basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c). An impairment or combination of impairments is not severe when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on the claimant's ability to work. 20 C.F.R. §§ 404.1521, 416.921; Social Security Ruling ("SSRs") 85-28, 1985 WL 56856 (Jan. 1, 1985), SSR 96-3p, 61 Fed. Reg. 34468 (July 2, 1996); SSR 96-4p, 61 Fed. Reg. 34488 (July 2, 1996).[3] If a claimant does not have a severe medically-determinable impairment or combination of impairments, then an ALJ will

---

[3] SSRs are the Agency's official interpretations of the Act and its regulations. *See Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009); *see also* 20 C.F.R. § 402.35(b)(1). SSRs are entitled to some deference as long as they are consistent with the Act and Agency regulations. *See Bray*, 554 F. 3d at 1223. "SSRs do not carry the 'force of law,' but they are binding on ALJs nonetheless." *Id*. at 1224.

make a finding that a claimant is not disabled. If a claimant has a severe medically-determinable impairment or combination of impairments, then an ALJ's analysis proceeds to the third step.

At step two in the Decision, the ALJ found that Ms. Conejo had the following severe impairments: (i) degenerative disc disease of the cervical and lumbar spine (status post three cervical spine surgeries with a revision), (ii) seizure disorder, and (iii) adjustment disorder with mixed features. AR 12. These impairments were considered "severe" in combination. *Id*. All other impairments were deemed "non-severe" because the record did not show any significant limitations associated with such impairments. *Id*. Conejo complained of back, neck, lower extremity, and upper extremity pain. The ALJ noted that "pain, per se, was not a medically determinable impairment and could simply be a symptom associated with intermittent-strain." *Id*. During the hearing, she testified that she experienced "very severe headaches" three times a week. AR 51. The ALJ concluded that her headaches were "adequately controlled with medications and thus, non-severe." AR 29. However, the ALJ still considered any alleged symptoms in determining her RFC. Because Conejo had three severe medically-determinable impairments, the ALJ's analysis proceeded to the third step.

### C. Step Three

Step three of the disability evaluation requires an ALJ to determine whether a claimant's impairments or combination of impairments meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, which is commonly referred to as the "Listings." 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.826. If a claimant's impairment or combination of impairments meet or equal the criteria of the Listings and meet the duration requirement, 20 C.F.R. §§ 404.1509, 416.909, then an ALJ makes a finding of disability. 20 C.F.R. §§ 404.1520(h), 416.920(h). If a claimant's impairment or combination of impairments does not meet or equal the criteria of the Listings or meet the duration requirement, then the analysis proceeds to the next step.

When the SSA evaluates the severity of mental impairments, 20 C.F.R. § 404.1520a requires the use of a "special technique" to evaluate four broad functional areas known as the "Paragraph B Criteria" in Listing 12.00C of the Listing of Impairments set forth at 20 C.F.R., Part

404, Subpart P, Appendix 1. *Id. See also* 20 C.F.R. § 1520a (explaining the psychiatric review technique); SSR 96-8p, 61 Fed. Reg. 34474 (July 2, 1996) (noting that application of the technique is documented on a Psychiatric Review Technique Form). To satisfy Paragraph B criteria, mental impairments must result in at least two of the following: (i) marked restriction in activities of daily living; (ii) marked difficulties in maintaining social functioning; (iii) marked difficulties in maintaining concentration, persistence, or pace; or (iv) repeated episodes of decompensation, each of extended duration. *See, e.g.*, *id.* § 12.04(B). A "marked" limitation means "more than moderate but less than extreme." *Id.* § 12.00(C). Repeated episodes of decompensation with extended duration means three episodes within one year, or an average of once every four months, each lasting for at least two weeks. *Id.* § 12.00(C)(4).

If the Paragraph B criteria are not met, a claimant may nevertheless be found disabled under alternative "Paragraph C criteria." *Id.* § 12.00(A). Under the regulations, Paragraph C criteria are considered only if the Paragraph B criteria are not satisfied. *Id.* Paragraph C criteria require a medically documented history of a chronic affective disorder of at least two years duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: (1) repeated episodes of decompensation each of extended duration; or (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) current history of one or more years in ability to function outside a highly supportive living arrangement, with an indication of continued need for such arrangement. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.02(C), 12.03(C), 12.04(C), 12.05(C), 12.06(C).

At step three in the Decision, the ALJ found that the evidence did not support a finding that Ms. Conejo had the severity of symptoms required, either singly or in combination, to meet or equal Listings 11.02 (convulsive epilepsy), 11.03 (non-convulsive epilepsy); 1.04 (disorders of the spine), 12.04 (affective disorders), and 12.06 (anxiety-related disorders). AR 12–13. No treating or examining physician stated findings equivalent in severity to the criteria of any listed impairment, and the evidence did not present medical findings equivalent in severity to the criteria

13

of any listed impairment.  *Id*.

With regard to Listings 12.04 and 12.06, the ALJ specifically evaluated the Paragraph B Criteria and concluded that Conejo's mental impairments did not satisfy the criteria.  AR 13–14. The evidence showed that she suffered: (i) no restriction on activities of daily living; (ii) no difficulties in social functioning; (iii) moderate difficulties in concentration, persistence, or pace; and (iv) no episodes of decompensation.  *Id*.  The ALJ also considered Paragraph C criteria for Listings 12.04 and 12.06.  AR 14.  However, the record lacked evidence of Paragraph C criteria. *Id*.  The ALJ concluded that Ms. Conejo did not have an impairment or combination of impairments that meet or medically equal one of the impairments described in the Listings.  *Id*. As such, the ALJ's analysis continued to her RFC.

**D.    Step Four – RFC**

The fourth step of the disability evaluation evaluates whether a claimant has the RFC to perform her past relevant work ("PRW").  20 C.F.R. §§ 404.1520(f), 416.920(f).  To answer this question, an ALJ must first determine a claimant's RFC.  20 C.F.R. §§ 404.1520(e), 416.920(e). RFC is a function-by-function assessment of a claimant's ability to do physical and mental work-related activities on a sustained basis despite limitations from impairments.  SSR 96-8p, 61 Fed. Reg. 34474 (July 2, 1996).  In making this finding, an ALJ must consider all the relevant evidence such as symptoms and the extent to which they can be reasonably be accepted as consistent with the objective medical evidence and other evidence.  20 C.F.R. §§ 404.1529, 416.929; SSR 96-4p, 61 Fed. Reg. 34488 (July 2, 1996); SSR 96-7p, 61 Fed. Reg. 34483 (July 2, 1996).  To the extent that statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, an ALJ must make a finding on the credibility of a claimant's statements based on a consideration of the entire case record.  An ALJ must also consider opinion evidence in accordance with the requirements of 20 C.F.R. §§ 404.1527 and 416.927 as well as SSR 96-2p, 61 Fed. Reg. 34489 (July 2, 1996); SSR 96-5p, 61 Fed. Reg. 34471 (July 2, 1996); and SSR 06-3p, 71 Fed. Reg. 45593 (Aug. 9, 2006).

After considering the entire record, the ALJ concluded that Ms. Conejo had the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a):

> She could lift and carry no more than five pounds, frequently, and ten pounds, occasionally. She could sit for six hours, cumulatively, in an eight-hour workday. She could stand and/or walk for two hours, cumulatively, in an eight-hour workday. Due to moderate restriction in concentration, persistence, or pace, she was limited to simple tasks and instructions, characteristic of the unskilled occupational base. Secondary to her seizure condition, typical seizure precautions were necessary (such as no exposure to unprotected heights or dangerous moving machinery).

AR 14–15. In making this finding, the ALJ "considered all symptoms, and the extent to which these symptoms could reasonably be accepted as consistent with the objective medical evidence, and the other evidence." AR 15. He also considered opinion evidence. *Id*. After considering the evidence of record and the updated medical exhibits, the ALJ found that Conejo's medically determinable impairments "could not reasonably be expected to produce the alleged symptoms, to the extreme degree alleged." *Id*. He therefore found that "her statements concerning the intensity, persistence, and limiting effects of these symptoms were not substantially credible, in consideration of the record in its entirety." *Id*.

### 1. Medical Symptoms

Insofar as Ms. Conejo alleged symptoms and functional limitations that would preclude her from performing the activities described in her RFC, the ALJ determined that her statements were not supported by the objective findings of the medical record and were inconsistent with the medical opinion evidence, exaggerated, and not fully credible. AR 30. Conejo alleged symptoms and limitations arising from seizures; headaches; cervical spine injuries; degenerative disc disease of the lumbar spine; numbness; muscle stiffness; muscle spasm; spinal, right hand, and left arm pain; panic attacks; anxiety; and depression. AR 15. However, the ALJ found "rampant inconsistencies" between her allegations and the findings of her treating doctors. *Id*.

For example, multiple treatment notes described Ms. Conejo's steady progress. *See, e.g.*, AR 359 (Mar. 2, 2011: Siegler noting that she had "improvement of her radicular pain"); AR 371 (Apr. 15, 2011: primary care notes of Dr. Sood stating that she was feeling good and was asymptomatic); AR 377–78 (May 16, 2011: Kabins noting that she "made excellent progress" after the second surgery); AR 487 (Dec. 2, 2011: Kabins noting after the third surgery that she was "markedly improved" overall from her preoperative status). AR 451 (Mar. 8, 2012: Siegler noting that she "was doing well with respect to her neck" and recommending a home exercise program);

AR 485 (Mar. 12, 2012: Kabins noting that she was "neurologically stable" and recommending physical therapy); AR 556 (July 11, 2012: Kabins noting that she had "residual neck discomfort, although tolerable"); AR 531 (Nov. 21, 2012: Novero documenting Conejo's report that "after her third surgery, her neck pain did improve"); AR 514 (Mar. 14, 2013: Novero noting that Conejo still experienced occasional headaches and migraines and recurrent seizures, but they were "lessening in frequency"). Trigger point injections and medications for neck and back pain were repeatedly described as helpful. AR 19 (citing AR 462, 464, 466, 476); *see also* AR 608 (Oct. 25, 2012: Siegler noting that her remaining neck pain was "controlled with medication"). Ms. Conejo also reported benefit from the medications for her mental health symptoms and had stopped taking Zoloft by February 2012. AR 24 (citing AR 596).

The ALJ noted that objective examinations by different doctors documented "relatively minimal spinal or other physical deficits." AR 28. Dr. Housley's objective examination of Conejo was "completely unremarkable" even though Conejo was involved in the second accident about six weeks prior. AR 18, 310–11, 541–44. Dr. Novero's examination found no tenderness or spasms in Conejo's back, thoracic spine, or lumbosacral spine around the same time she began reporting lower back pain to Drs. Kabins and Siegler. AR 23 (citing AR 533). Her motor and muscle strength was 5/5, her gait and coordination was normal. *Id*. The ALJ found that these notations suggested that her "spinal signs and symptoms were intermittent in nature, as opposed to a daily burden." AR 28.

The ALJ also determined that the results of several medical tests did not support Conejo's allegations. AR 28. The results of her EMG/nerve conduction studies were "indicative of exaggeration" because they offered minimal support for her allegations of radiculopathy. *Id*. The ALJ stated that impressions "included no electrodiagnostic evidence of cervical radiculopathy, brachial plexopathy, peripheral polyneuropathy. or left upper extremity entrapment neuropathy." AR 20. The CT myelogram showed "minimal findings" to substantiate the third cervical surgery. AR 28. The test showed "showed straightening of the lordosis; a merely mild disc bulge at C3 -4; a minimal disc bulge at C-5; no evidence of canal or neuroforaminal stenosis; and intact fusion hardware at C5-7. There was no evidence of loosening." AR 20. Although Dr. Kabins disagreed

with these findings, the ALJ noted that radiographs the surgeon reportedly relied on as showing lucency and loosening were not submitted to the ALJ for review.  AR 20, 28.

Based on the record, the ALJ determined that Ms. Conejo's "medication regimen was quite helpful and controlled her spinal pain."  AR 15.  Comparing the record to a medication list (AR 233) she submitted, the ALJ stated that the medications prescribed were "to a lesser degree" than what she listed.  *Id.*; *see also* AR 608 (Siegler noting that Conejo's neck pain was "controlled with medication").  The ALJ found that the record generally reflected that the side effects of her medications "were minimal, easily optimized, and would not have interfered with her ability to perform work activities in any significant manner."  AR 31.

Three of Conejo's treating physicians opined that she was unable to work in medical source statements and a seizure questionnaire submitted in April 2013.  AR 27–28.  Dr. Kabins submitted a standardized form in which he opined that Conejo "could perform a less than 'sedentary' level of exertion," and stated limitations on lifting, carrying, sitting, standing, and walking.  AR 27 (citing AR 586–87).  She could not "balance, stoop, kneel, squat, or climb ladders and scaffolds." *Id*.  She would miss more than four days of work per month and require additional 15-minute breaks during the workday.  *Id*.  Dr. Kabins stated that the limitations were applicable from September 2011 onward, and the ALJ noted that the September 2011 date contradicted her alleged disability onset date of July 20, 2010.  *Id*.  Dr. Siegler also submitted a short statement opining that Ms. Conejo was "disabled by cervical and lumbar degenerative disc disease, as well as her seizure condition."  AR 27 (citing AR 600).  He noted that her function was "impaired to the degree that she is functionally disabled."  AR 600.

The ALJ found that the clinical evidence "suggested that the opinions of Drs. Kabins and Siegler were tantamount to extreme patient advocacy, only partially substantiated by the objective findings of the medical record.  AR 28. He found Dr. Kabins' lifting and carrying restrictions were "wholly substantiated" by her history of two auto accidents and the cervical surgeries and repair seen in the record.  AR 27.  However, the ALJ found that the "other restrictions were repeatedly disputed by his updated treatment notes, as well as those of other medical providers."  *Id*.  Although Dr. Siegler offered no RFC restrictions, his disability opinion was not accepted for the same

17

reasons. *Id*. The ALJ found that "their opinions were far too restrictive in view of the documented improvement noted in the record." AR 28. As a result, the ALJ determined their disability opinions were "nothing more than patient advocacy." *Id*.; *see also* AR 30–31 ("I could not ignore the objective examinations of other treating professionals around the same time of Dr. Kabins' surgical lumbar recommendation, which reflected minimal evidence of lumbar spasm or tenderness.").

Dr. Novero completed a seizure questionnaire stating that he diagnosed Conejo with complex-partial seizures and migraines. AR 549–52. He indicated that she loses consciousness and averages two seizures per week. AR 549. However, the ALJ noted that she testified she was "having three seizures per week, even with medication." AR 28.[4] The neurologist stated that her postictal manifestations were confusion, exhaustion, irritability, and visual blurriness. *Id*. (citing AR 550). Novero opined that "she was 'unable to work at this moment' and would miss more than four days of work per month." AR 28 (citing AR 552). However, because her seizures consisted of falling or passing out, Novero said Conejo "would need to avoid working in elevated areas or around hazards (such as sharp objects)." *Id*. The ALJ noted that typical seizure restrictions do not "preclude all individuals with a seizure condition from all work." AR 28.

In explaining how he reached his RFC determination, the ALJ noted the weight he afforded the multiple providers. The ALJ gave the opinions of treating and examining physicians, Drs. Kabins and Siegler "minimal weight" as they were repeatedly disputed by their treatment notes, as well as those of other medical providers. AR 27. Nevertheless, the ALJ adopted Dr. Kabins' lifting and carrying restrictions to five pounds, frequently, and ten pounds, occasionally, because the reductions were "wholly substantiated" by her history of two motor vehicle accidents and the cervical surgeries and repair seen in the record. *Id*. The ALJ afforded Dr. Novero's opinion "little weight," except for the typical seizure restrictions. AR 28. Conejo's testimony reporting "three

---

[4] Ms. Conejo testified that she was having *severe headaches* three times a week, not seizures. AR 51. When asked how often she was having seizures, she testified that she was having three seizures a week at first, but with an increase in her medication the frequency dropped to five a month. *Id*. She stated that the seizures were "getting better" but she still had frequent headaches lasting two days and the medication had not yet stabilized. *Id*.

seizures per week" was inconsistent with Novero's treatment notes, which showed that "after a few short visits that her seizures and headaches had decreased with mere medication." AR 29; *see also*, *supra*, n.4. Additionally, a "brain MRI showed no evidence of acute intracranial pathology." AR 29. The ALJ further noted that she was "treated with infrequent visits with medication management, which constituted nothing more than routine, conservative care." AR 28.

The ALJ also considered the opinions of the state agency review physicians and psychologist and a consulting examiner. The opinion of Mayenne Karelitz, M.D., was given "little weight" as is it was "too expansive in view of the claimant's surgical history, bulging lumbar discs, and aggregate conditions." That is, the ALJ found that Dr. Karelitz's opinions had not adequately taken these conditions into account. AR 29, 70–84. The opinions of psychologists Pastora Roldan, Ph.D., and R. Toigoe, Ph.D., were given "significant weight" as they were "generally consistent with the minimal mental health treatment history." AR 29. Both psychologists agreed that Conejo "could understand, remember, and carry out simple, repetitive tasks with sustained concentration. She had no impairment in working with the public, co-workers, or supervisors. She could conduct her activities of daily living independently." AR 29 (citing AR 70–84, 392–409).

The ALJ gave the opinion of consulting psychological examiner Irene Zucker, Ph.D., "moderate weight." AR 25. The ALJ found that Dr. Zucker's statement that Conejo "possibly could not sustain the concentration necessary for simple tasks was directly refuted by the minimal treatment record for mental health, as well as the overall record." *Id*. Ms. Conejo's counseling notes "reflected a mere discussion of her marital stressors and/or physical concerns." AR 25–26. Her mental status examinations noted minimal findings, "despite an occasionally tearful affect and some mood swings, and there was no record of psychiatric admission or suicidal ideation." AR 25. Given the litigation [involving her two automobile accidents] described in the record, the ALJ found that Conejo's mental health records "certainly called into question the motivation behind the minimal treatment." AR 26.

Based on the medical record, the ALJ concluded that, although Ms. Conejo's "impairments could reasonably be expected to cause some symptoms, the intensity she alleged, and their impact on her functioning, were not supported by the totality of evidence." AR 29–30. "Nothing in the

record substantiated any more than a reduction to a 'sedentary' level of exertion." AR 30. Thus, the ALJ found these factors, "coupled with the mild objective findings, occasional injections, and helpful medications, tipped the scale towards a finding that she was not disabled at any time material, herein." AR 30.

### 2. Functional Limitations

The Decision states that Ms. Conejo's alleged symptoms and functional limitations that would have precluded her from performing the activities described in her RFC were disproportionate to the objective findings of the medical record, inconsistent with the medical opinion evidence, exaggerated, and not fully credible. AR 30. In his determination regarding the degree of her functional limitation, the ALJ assessed the four broad categories found in Paragraphs B and C of the adult mental disorders listings. AR 14, 27. With regard to episodes of decompensation, the ALJ observed that she had experienced no episodes of decompensation. AR 14, 27, 29 (citing AR 392–409). This was consistent with Conejo's testimony and medical records showing she had never been psychiatrically hospitalized. AR 14, 27.

The ALJ found that Ms. Conejo had "no difficulties" in activities of daily living or social functioning. AR 13, 27. She testified that she was able to complete some household chores with her son's help. AR 13, 52. The record reflected that she maintained her own personal hygiene, cooked light meals, did laundry, listened to music, occasionally went out to eat with her family, went grocery shopping, and traveled out of the country to Costa Rica. AR 13, 31; *see also* AR 16–17 (citing AR 176–83 (third party function report by Joann Hurley)). She reported to Dr. Zucker that a typical day consisted of "eating breakfast, taking medication, lying down, trying to keep busy at home, reading, watching television, and feeding her pets." AR 31 (citing AR 388). She also talked with family members and one friend on a daily basis. AR 31. The ALJ found that maintaining telephone contact with her family and friends suggested "adequate social functioning. *Id.* Conejo reported to Dr. Zucker that her hobbies and interests included reading and talking with others, and the ALJ found that her statement "significantly reduced her credibility as far as the impact of her alleged impairments on her activities of daily living." *Id.* (citing 20 CFR 404.1529(c)(3)(i)(iii)).

Ms. Conejo's concentration, persistence, or pace showed "moderate difficulties," which the ALJ "fully accounted for" by limiting her to performing only simple tasks and instructions. AR 27. The ALJ noted that, although she "reportedly had difficulty concentrating on tasks until completion, as she was more forgetful," she also denied any difficulty understanding or remembering what she read or saw on TV. AR 31, 388. Dr. Zucker noted that she appeared to have "some impairment in concentration," though it was "likely exacerbated by her pain." AR 389. She had the "cognitive ability to carry out at least simple one to two step instructions," but her performance of various tasks, especially on a sustained basis, appeared to be "more dependent on her physical problems." *Id.* If her medical conditions were resolved, Dr. Zucker opined that she "would be able to function in a vocational setting successfully on a sustained basis." *Id.* Thus, Ms. Conejo's ability to function successfully in a work environment on a sustained basis appeared to be "guarded." *Id.* However, the ALJ found that the "totality of the evidence did not support her allegations that she could not perform 'sedentary' work with typical seizure restrictions, and did not support the extremity of her allegations." AR 31. His findings tracked the opinions of the state agency psychologists. *See* AR 29, 70–84, 392–409.

### 3. Credibility

The ALJ found that Ms. Conejo's own actions, inconsistent statements and testimony, and the lack of objective medical evidence undermined her credibility and demonstrated exaggeration of symptoms and functional limitations. AR 15, 30. Notably, the ALJ pointed out that she had been able to take multiple trips out of the country during the relevant period, although she failed to disclose such trips in her function reports. AR 31 (citing AR 464–65 (Dr. Siegler's Aug. 31, 2011 notes stating that Conejo "had a plane ride and flared her pain but the medication [was] helping"); AR 184–91, 203–10 (function reports)); *see also* AR 309–12 (Dr. Housley's Apr. 14, 2010 notes stating that she had "traveled recently out of the country to Costa Rica"); AR 556 (Dr. Kabins July 11, 2012 notes stating she was "taking a short hiatus to Costa Rica" and would return to see him in late August 2012); AR 613 (Dr. Siegler's Sept. 27, 2012 notes stating that she was "going out of the country for a family emergency"). Her ability to go on airplane rides during the relevant period suggested that her daily activities were not as limited as she alleged. AR 20.

The ALJ also found inconsistencies between the lay opinions and the overall record, which suggested that Conejo "was not fully credible." AR 17. A third party function report by a friend of more than 11 years, Joann Hurley, suggested that Conejo's "activities of daily living were virtually unfettered" because she was "functionally able to shop, go out to eat, talk on the telephone, watch television, take care of pets and her teenage son, do some household chores, prepared daily meals, and the like." AR 16–17 (citing AR 176–83). A seizure witness form completed by Conejo's son, Joseph Gunter, said she experienced five to six seizures per month, which lasted from one to three minutes if minor and two to five minutes if major. AR 16 (citing AR 238). Gunter reported that his mother lost consciousness, had jerking movements, bit her tongue, knocked her head on the kitchen cabinet, hurt her leg on the kitchen floor, twisted her body, might blink, mumble, and pull at clothing. AR 238. However, the ALJ noted that "most of these manifestations were absent from the notes of the treating neurologist, Dr. Novero." AR 16. Ms. Conejo's neighbor, Paula Ervin, also completed a seizure witness form. AR 16 (citing AR 239). Ervin witnesses one seizure in April 2013 lasting one or two minutes. *Id*. Ervin described a typical seizure for Conejo to include losing consciousness and having jerking, thrashing movements. AR 239. During the seizure Ervin witnessed, Conejo made a fist with both hands, had jerking legs, and moved her head from side to side. *Id*. The ALJ described this observation as "curious" because "notes in the record reflected that the claimant was not able to rotate her head secondary to her cervical surgeries and history." AR 16.

The ALJ afforded the lay opinions "moderate weight" but noted that they did not establish disability. *Id*. Like Conejo's allegations, the ALJ found that "their statements were not wholly consistent with the opinions and observations by medical doctors and psychologists in this case regarding non-disability." *Id*. The ALJ stated that Gunter's seizure statement was inconsistent with Dr. Novero's treatment notes because he reported "far more symptoms and signs" in his statement than she reported to the neurologist, "suggesting extreme exaggeration." AR 17. Ervin's statement was discounted because she "had only witnessed one brief seizure." *Id*. In addition, Ervin's observation that Conejo moved her head from side to side during seizures was contradictory to Conejo's report that she had not driven since 2010 because she was unable to turn

her head from side to side.  AR 31.  The ALJ found that the lay opinions, in conjunction with the overall record, reinforced his conclusion that she "was not fully credible."  AR 17.

Dr. Novero's February 2013 treatment notes state that Ms. Conejo was having at least two seizures a week (*i.e.*, eight per month).  AR 518.  One month later, she reported to Dr. Novero that she was still experiencing recurrent seizures but they were lessening in frequency.  AR 514.  Dr. Novero's April 2013 seizure questionnaire indicated that she averaged two seizures per week.  AR 549.  Conejo testified that at first she suffered three seizures a week (*i.e.*, 12 per month), but with an increase in her medication the frequency dropped to five a month.  AR 51.  The ALJ found that her testimony was inconsistent with Novero's treatment notes.  AR 29.

Additionally, the ALJ noted that she did not seek or receive treatment for injuries on the day of the second accident in 2010 and she had personal injury lawsuits pending from the accidents.  AR 30.  The ALJ found that the lawsuits "were a likely disincentive to seeking work (due to a desire to increase the potential a ward of monetary damages)."  *Id*.  These facts subtracted from the overall credibility of her allegations.  *Id*.

Considering the record as a whole, the ALJ held that the "totality of the evidence did not support her allegations that she could not perform 'sedentary' work with typical seizure restrictions, and did not support the extremity of her allegations.  All of these factors greatly detracted from any credibility that could be afforded her extreme subjective complaints of symptoms and functional limitations."  AR 31.

### E.    Step Four – Ability to Perform PRW

Once an ALJ has determined a claimant's RFC as an initial consideration at step four, an ALJ utilizes the RFC assessment to determine whether a claimant can perform her PRW.  20 C.F.R. §§ 404.1520(f), 416.920(f).  PRW means work a claimant performed within the last 15 years, either as the claimant actually performed it or as it is generally performed in the national economy.  20 C.F.R. § 404.1560(b).  In addition, the work must have lasted long enough for a claimant to learn the job and to perform it as SGA.  20 C.F.R. §§ 404.1560(b), 404.1565, 419.960(b), 416.965.  If a claimant has the RFC to perform his or her past work, then an ALJ makes a finding that a claimant is not disabled.

At step four in the Decision, the ALJ concluded that Ms. Conejo was not capable of performing her PRW as a management trainee or anesthetist pursuant to the vocational expert's testimony. AR 31. As a result, the ALJ continued to step five.

### F. Step Five

Step five of the disability evaluation requires an ALJ to determine whether a claimant is able to do any other work considering his RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(g), 416.920(g). If he or she can do other work, then an ALJ makes a finding that a claimant is not disabled. Although a claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Commissioner. The Commissioner is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do. *Yuckert*, 482 U.S. at 141–42; *see also Beltran v. Astrue*, 700 F.3d 386, 389 (9th Cir. 2012) (citing 42 U.S.C. § 423(d)(2)(A)).

The Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, are commonly known as the "Grids," and specific sections are referred to as a Medical-Vocational rule. The Grids aid the ALJ in the analysis at step five for cases that cannot be evaluated on medical considerations alone. The Grids consist of three tables that each represent a different physical exertional level: sedentary, light, and medium work. *Id*. Each table also presents the vocational factors Congress has identified as important: age, education, and work experience. If a claimant can perform all or substantially all of the exertional demands at a given exertional level, the Grids direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile. SSR 83-11, 1983 WL 31252 (Jan. 1, 1983). When a claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has non-exertional limitations, the Grids are used as a framework for decision-making, unless there is a particular rule that directs a conclusion of "disabled" without considering the additional exertional and/or non-exertional limitations. *See* SSR 83-12, 1983 WL 31253 (Jan. 1, 1983); SSR 83-14, 1983 WL 31254 (Jan. 1, 1983). If the claimant has solely non-exertional limitations, Medical-Vocational Rule 204.00 provides a framework for decision-making. SSR 85-15, 1985

WL 56857 (Jan. 1, 1983).

At step five in the Decision, the ALJ determined that Ms. Conejo could perform jobs that exist in significant numbers in the national economy, considering her age, education, work experience, and RFC, in conjunction with the Grids. AR 32–33. On the alleged date of disability, she was 38 years old, which categorized her as a younger individual age 18–49. AR 31. Conejo has a high school equivalency and a trade certificate for laser skin care and she is able to communicate in English. AR 32. The ALJ found that transferability of her job skills was not was not material to the determination of disability, because using the Grids as a framework supported a finding that she was not disabled, whether or not she had transferable job skills. *Id.*

If Conejo had the RFC to perform the full range of sedentary work, the ALJ noted that Medical-Vocational Rule 201.28 would direct a finding of "not disabled." *Id.* To determine the extent to which her limitations eroded the unskilled light occupational base, the ALJ asked a vocational expert, Kenneth Lister, M.Ed., a hypothetical question regarding whether jobs exist in the national economy for an individual with her age, education, work experience, and RFC. AR 32, 57–60. Citing the Dictionary of Occupational Titles ("DOT"), Mr. Lister testified that the individual would be able to perform the requirements of three representative jobs:

1. Final assembler (optical) (DOT 713.687-018, 1991 WL 679271), which was sedentary, unskilled work with a specific vocational preparation code ("SVP") of 2, and 125,000 jobs available in the national economy;

2. Charge account clerk (DOT 205.367-014, 1991 WL 671715), which was sedentary, unskilled work, SVP 2, with 160,000 jobs available in the national economy; and

3. Call out operator (DOT 237.367-014, 1991 WL 672186), which was sedentary, unskilled work, SVP 2, with 187,000 jobs available in the national economy.

AR 32, 58. The ALJ found that these three representative jobs were significant numbers and Mr. Lister's testimony was consistent with the DOT. AR 32. Considering Ms. Conejo's age, education, work experience, and RFC, the ALJ determined that she could perform jobs that exist in significant numbers in the national economy. *Id.* A finding of "not disabled" was, therefore, appropriate under the framework of the Grids. *Id.*

**III.     THE PARTIES' POSITIONS ON APPEAL**

**A.     Conejo's Position**

Ms. Conejo seeks reversal and remand of the Decision on the grounds that the ALJ erred in assessing her credibility and, therefore, the ALJ's RFC is not supported by substantial evidence. *See* Pl.'s Mot. (ECF No. 18).   She argues that the medical evidence she submitted "wholly associates her subjective symptoms with a clinically demonstrated impairment." *Id*. at 7.   Her contentions are supported by Dr. Zucker's opinion stating that Conejo would have difficulty performing work on a sustained basis, and that her ability to perform various tasks on a sustained basis appeared to be more dependent on her physical problems. *Id*. at 8 (citing AR 389).   Dr. Zucker's opinions are consistent with Dr. Kabins, who was in the best position to provide an opinion regarding Conejo's impairments since he was her treating physician over an extended period of time.   Although her treatment notes documented improvement after surgeries, they also show that she was experiencing back, hip, and left lower extremity pain. *Id*. at 9.   Thus, any improvements were short lived, and Dr. Kabins found that she was a candidate for lumbar spine decompression and reconstruction. *Id*. (citing AR 553).   Based on the consistency between the opinion of Dr. Zucker, a consultative examiner, and Dr. Kabins, her treating physician, Conejo asserts that the ALJ's stated reasons for rejecting these opinions are not legally sufficient, *i.e.*, specific and legitimate. *Id*. at 8–9 (citing *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1996)). Rather, the ALJ's summary of the evidence demonstrates abundant objective evidence to support her complaints.

In addition, Ms. Conejo faults the ALJ's findings that she exaggerated her complaints and was unmotivated to return to work because of a desire for secondary financial gain through her personal injury lawsuits. *Id*. at 10.   Conejo testified that she worked with pain after the first surgery because she was a single mother and needed to work to pay bills. *Id*. (citing AR 48–49).   She should not be discredited for filing legitimate personal injury lawsuits, especially since any recovery therein is "merely speculative."   Reply (ECF No. 23) at 5.   She also points out that she tried to return to work after the second surgery but the attempt failed.   Mot. at 10 (citing AR 377). Conejo maintains that her financial motivation for obtaining benefits is not a valid reason for

discrediting her testimony. Although she concedes that the ALJ is permitted to consider the extent of her daily activities in assessing credibility, she argues that the ALJ did not make specific findings relating to her daily activities and their transferability to warrant an adverse credibility determination. *Id*. at 11 (citing *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007)). The ALJ failed to adequately explain how her routine activities translated into the ability to perform work on a full-time, competitive basis. Reply (ECF No. 23) at 5.

In her Reply, Ms. Conejo acknowledges that her treatment after the three cervical surgeries "has been relatively conservative," and she has managed her pain with medication and injections. *Id*. at 4. Citing an unpublished decision of the Central District of California, Conejo asserts that epidural injections "are not considered conservative treatment." *Id*. at 4 (citing *Oldham v. Astrue*, 2010 WL 2850770, at *9 (C.D. Cal. July 19, 2010)).[5] Nevertheless, she maintains she cannot be discredited for failing to pursue non-conservative treatment options where none existed, and the record does not show that aggressive treatment options were appropriate or available.

Assuming arguendo that there was a lack of objective medical findings, this reason alone is insufficient to discount her subjective complaints. *Id*. at 6 (citing *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004)). Because her pain and resultant limitations are consistent with the opinions of Drs. Kabins and Zucker, the ALJ lacked a clear and convincing reason to discount her complaints. Ms. Conejo has demonstrated that the ALJ's Decision does not constitute a rational interpretation in light of the record as a whole. Because the ALJ's error is so egregious, she asserts that the court should credit her testimony as true and remand for an immediate award of benefits.

### B.    The Commissioner's Position

The Commissioner seeks affirmance of the ALJ's Decision asserting that the ALJ properly assessed Ms. Conejo's credibility and determined that she is not disabled. Cross-Mot. & Resp. (ECF Nos. 21–22).

The Commissioner maintains that the ALJ's credibility finding was specific and supported

---

[5] In *Oldham*, the court found that multiple epidural injections in operation-like settings evidenced the lengths to which the plaintiff went to obtain pain relief. 2010 WL 2850770, at *9. "The length of the record over time, the intensity of certain procedures, and the evidence of the numerous medications" the plaintiff took to alleviate pain rendered "unconvincing" any argument that her treatment was conservative. *Id*.

by substantial evidence. For example, the ALJ reasonably found that Conejo's credibility was undermined by "rampant inconsistencies" in the record. *Id*. at 4 (citing AR 15, 51, 218). The Decision addressed the medical evidence showing that after surgery, she managed her pain effectively with medication and injection therapy and with no side effects. The conservative treatment Conejo received, along with the efficacy of such conservative treatment, contradict her claim that she could not perform sedentary work. *Id*. at 5 (citing AR 30, 354–56, 358–59, 377–80, 462–67). The ALJ did not rely solely on evidence of her improvements after surgery to conclude that she was not disabled. Rather, the ALJ properly found that her postoperative improvement and maintenance with conservative treatment undermined her claims of disability.

The Commissioner argues that the ALJ reasonably determined that Ms. Conejo's "virtually unfettered" activities of daily living belied her claims of disabling pain and limitations. *Id*. at 6 (citing AR 13, 16–17, 31, 53, 464, 556). Her activities included maintaining her personal care, caring for her teenage son and pets, performing some household chores, preparing daily meals, going out to shop and eat, talking on the telephone, and watching TV and reading without comprehension difficulties. Most notably, after her alleged onset date of July 20, 2010, Conejo took multiple trips that required her to fly despite testifying that she could not sit for more than 30 minutes at a time without having to stand up. *Id*. (citing AR 13, 53, 141). She informed multiple treating physicians that she was traveling via airplane. *Id*. (citing AR 20, 22, 464, 556). Her ability to take a flight that would presumably require her to remain seated for significant periods of time undermined her claims of disabling limitations. Thus, the ALJ reasonably found that she could perform the limited range of sedentary work set forth in her RFC.

The Commissioner points out that the ALJ did not discredit Ms. Conejo's claims due to a financial motivation to obtain benefits. He found that she may not have been motivated to work, aside from any physical and/or mental impairment, based on her potential recovery of money damages. Thus, the ALJ did not err by finding that her pending personal injury lawsuit provided a disincentive for her to work, separate and apart from any impairment. *Id*. at 7 (citing AR 30, 418 (Conejo discussed settling her lawsuit)).

The Commissioner also asserts that the ALJ properly concluded that the objective medical

28

evidence did not support Ms. Conejo's alleged limitations. *Id*. at 7 (citing AR 19, 314–21, 443–48, 628–42). The ALJ provided a detailed summary of pertinent medical records, which included, among other evidence, minimal objective findings during physical examinations from September 2009 through April 2013. *Id*. Additionally, the ALJ adopted Dr. Kabins' lifting and carrying restrictions (lifting/carrying up to five pounds frequently, ten pounds occasionally). *Id*. at 9 (citing AR 27, 585). The court may not reweigh the evidence in Conejo's favor, but must defer to the ALJ when the record supports more than one rational interpretation. Because she failed to establish a reason to disturb the Decision, her request for reversal and/or remand should be denied.

## ANALYSIS AND FINDINGS

Reviewing the record as a whole, weighing both the evidence that supports and the evidence that detracts from the ALJ's conclusion, the court finds the ALJ's decision is supported by substantial evidence, and the ALJ did not commit legal error. The sole issue on appeal is whether the ALJ committed reversible error in failing to properly assess Conejo's credibility.

In assessing the credibility of a claimant's testimony regarding subjective pain or the intensity of symptoms, the ALJ engages in a two-step analysis. *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (citing *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009)). In the first step, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged. *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007); *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)). In this first step, a claimant need only show that his or her impairment could reasonably have caused *some degree* of the symptom alleged. *Garrison*, 759 F.3d at 1014 (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)). A claimant is not required to (i) show that the impairment could reasonably be expected to cause the severity of the symptom, or (ii) produce objective medical evidence of the pain or fatigue, or the severity thereof. *Id*.

If a claimant satisfies the first step of this analysis, and there is no evidence of malingering, the ALJ may only reject the claimant's testimony about the severity of her symptoms "by offering specific, clear and convincing reasons for doing so." *Brown-Hunter v. Colvin*, 806 F.3d 487, 493

(9th Cir. 2015) (quoting *Lingenfelter*, 504 F.3d at 1036); *see also Garrison*, 759 F.3d at 1014–15 (quoting *Smolen*, 80 F.3d at 1281); *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006) ("[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each.").[6]  As the Ninth Circuit has recognized, this is not an easy requirement to meet because the "clear and convincing standard is the most demanding required in Social Security cases." *Garrison*, 759 F.3d at 1015 (quoting *Moore v. Comm'r Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).  However, "the ALJ is not required to believe every allegation of disabling pain," otherwise disability benefits "would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." *Molina*, 674 F.3d at 1112 (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)).

In evaluating a claimant's testimony, the ALJ may use "ordinary techniques of credibility evaluation." *Molina*, 674 F.3d at 1112 (quoting *Turner v. Comm'r Soc. Sec.*, 613 F.3d 1217, 1224 n.3 (9th Cir. 2010)).  For example, an ALJ may consider factors such as: (i) inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct; (ii) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (iii) whether the claimant engages in daily activities inconsistent with the alleged symptoms; (iv) the observations of treating and examining physicians and other third parties regarding the claimant's symptoms; (v) functional restrictions caused by the symptoms; and (vi) the claimant's daily activities. *Molina*, 674 F.3d at 1112; *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1006 (9th Cir. 2015) (quoting *Smolen*, 80 F.3d at 1284) (amending and superseding opinion, 795 F.3d 1177, on denial of rehearing en banc).

"A finding that a claimant's testimony is not credible 'must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible

---

[6] The Commissioner maintains that the "clear and convincing" standard only applies in some circumstances and courts must apply the extremely deferential "substantial evidence" standard prescribed by Congress in 42 U.S.C. § 405(g).  *See* Cross-Mot. & Resp. (ECF Nos. 21, 22) at 4 n.3.  However, the Ninth Circuit has specifically and repeatedly rejected this position. *See*, *e.g.*, *Brown-Hunter*, 806 F.3d at 492–93 (noting that the Commissioner disputed the "clear and convincing" standard and finding that *Burrell v. Colvin*, 775 F.3d 1133, 1136–37 (9th Cir. 2014), foreclosed the Commissioner's argument); *Garrison*, 759 F.3d at 1014.

grounds and did not arbitrarily discredit a claimant's testimony regarding pain'." *Brown-Hunter*, 806 F.3d at 493 (quoting *Bunnell*, 947 F.2d at 345–46). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Brown-Hunter*, 806 F.3d at 493 (quoting *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998)); *see also Rounds*, 807 F.3d at 1006 (an ALJ must specify "which symptom testimony is not credible and what facts in the record lead to that conclusion") (quoting *Smolen*, 80 F.3d at 1284). "Although the ALJ's analysis need not be extensive, the ALJ must provide some reasoning" that will allow a reviewing court "to meaningfully determine whether the ALJ's conclusions were supported by substantial evidence." *Brown-Hunter*, 806 F.3d at 495 (quoting *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1103 (9th Cir. 2014)).

In this case, the ALJ's credibility findings provide specific, clear and convincing reasons for rejecting Conejo's testimony about the severity of her symptoms. The Decision specifically points out inconsistencies between her testimony, the medical records, and her function reports to support the credibility finding. For example, the ALJ noted that she had been able to take multiple trips out of the country to Costa Rica during the relevant period, although she failed to disclose these trips in her function reports. AR 31 (citing AR 464–65). The ALJ could reasonably conclude that her air travel on long flights to Costa Rica was inconsistent with her alleged symptoms and limitations, for example, her claim she could not sit for more than 30 minutes at a time. The function reports and third party function report of one of her friends were relied upon by the ALJ in describing her activities of daily living as "virtually unfettered." AR 16; *see also* AR 13–14, 17, 30–31. Her daily activities included maintaining her personal care, caring for her teenage son and pets, performing some household chores, preparing daily meals, going out to shop and eat, talking on the telephone, and watching TV and reading without comprehension difficulties.

An ALJ "may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting." *Molina*, 674 F.3d at 1112–13. Even when those activities suggest some difficulty in functioning, "they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." *Id.* at 1113 (citation omitted). Based on the testimony and

medical evidence, the ALJ could reasonably conclude that Conejo's activities, undermined her claims that she was incapable of doing sedentary unskilled work because of her pain. It was also reasonable for the ALJ to conclude that daily activities interacting with others, such as caring for her teenage son, going out to shop and eat, and talking on the telephone, were transferable to a work setting. These findings show that the ALJ did not reject Ms. Conejo's testimony based solely on a lack of medical evidence corroborating her subjective complaints.

Additionally, the court finds no legal error in the ALJ's evaluation of the medical evidence of record in assessing Ms. Conejo's credibility. To the extent there were conflicting opinions and testimony regarding the degree of Ms. Conejo's functional limitations, it was the ALJ's duty to resolve those conflicts. For highly fact-intensive individualized determinations like a claimant's entitlement to disability benefits, Congress has deferred to agency expertise and, for the sake of uniformity, has minimized the opportunity for reviewing courts to substitute their discretion for that of the agency. *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 621 (1966)). Consequently, it is the ALJ's duty "to determine credibility, resolve conflicts in the testimony, and resolve ambiguities in the record." *Id.* (citing 42 U.S.C. § 405(g) (directing that the Commissioner's findings shall be conclusive as to any fact supported by substantial evidence); *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

Here, although Conejo did undergo three significant cervical surgeries, the ALJ's credibility findings are a rational interpretation of the record as a whole. Multiple treatment notes described her steady progress, despite occasional setbacks and additional surgeries. Her medications and epidural injections for neck and back pain were repeatedly described as helpful. AR 19 (citing AR 462, 464, 466, 476); AR 608. She also reported benefited from the medications for her mental health symptoms. AR 24 (citing AR 596). A favorable response to conservative treatment may undermine a claimant's reports of the disabling nature of his or her pain. *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008). The ALJ also found that the results of several medical tests and objective examinations by different doctors contradicted Conejo's allegations of disabling pain and limitations. The opinions of Drs. Kabins and Siegler were

undermined by the findings of Drs. Housley and Novero from the same time period, as well as the negative results of two EMG/nerve conduction studies, a cervical CT/myelogram, a brain MRI, one of two EEG studies, and their own treatment records. It was the ALJ's duty to resolve conflicts between these findings, test results, and her treating physicians' opinions.

The ALJ's findings regarding Ms. Coneho's mild degree of functional limitations are supported by the opinions of the consultative examiner and the state agency review psychologist as well as the minimal mental health treatment records. Dr. Zucker opined that Conejo was able to manage her psychiatric symptoms with medication and she would likely be able to function in a vocational setting on a sustained basis if her medical condition was resolved. AR 389. Dr. Zucker assessed Conejo's mental health conditions and their impact on Conejo's ability to work. She did not assess or opine on Conejo's physical condition. Dr. Roldan found that all of Conejo's restrictions of activities of daily living and difficulties in maintaining social functioning were mild, and her difficulties in maintaining concentration, persistence or pace was moderate. AR 402. This was consistent with Dr. Zucker's findings. AR 384–91. The ALJ found that Conejo's conservative and minimal mental health treatment adequately treated Conejo's depression and anxiety. The mental health providers' treatment notes indicated that she was "less depressed" and "less anxious" after treatment, and mental status examinations over numerous counseling sessions reported no evidence of psychosis or suicidal/homicidal ideation. AR 415–20, 588–90, 592, 594. It was the ALJ's job to consider Dr. Zucker's statement about Conejo's ability to function in a vocational setting on a sustained basis and resolve any conflicts it presented with the medical evidence. If the record will support more than one rational interpretation, the court must uphold the Commissioner's interpretation. *See Burch*, 400 F.3d at 679. The ALJ's findings are amply supported by the record and inferences reasonably drawn from the record.

Additionally, the ALJ set forth specific, legitimate reasons supported by substantial evidence in the record to the extent he gave little weight to certain opinions of Drs. Kabins and Zucker. An ALJ must consider all medical evidence. *See* 20 C.F.R. § 404.1527(b). In general, a treating physician's opinion is entitled to more weight than an examining physician's, and an examining physician's opinion is entitled to more weight than a reviewing physician's. *Lester v.*

*Chater*, 81 F.3d, 821, 830 (9th Cir. 1995); 20 C.F.R. § 404.1527(d). Where a treating physician's opinion is not contradicted by another physician, it may be rejected only for "clear and convincing" reasons, and where it is contradicted, it may not be rejected without "specific and legitimate reasons" supported by substantial evidence in the record. *Lester*, 81 F.3d at 830. However, an ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings. *See Chaudhry v. Astrue*, 688 F.3d 661, 671 (9th Cir. 2012); *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009). Additionally, an ALJ is not required to accept every element of a medical source's opinion in order to give that opinion weight. *Magallanes v. Bowen*, 881 F.2d 747, 753 (9th Cir. 1989) (quoting *Russell v. Bowen*, 856 F.2d 81, 83 (9th Cir. 1988)).

As explained, the Decision is supported by substantial evidence and it included specific and legitimate reasons why the ALJ rejected portions of Drs. Kabins and Zucker's opinions. The Decision exhaustively reviewed and summarized Ms. Conejo's medical records. The ALJ found that these doctors' opinions were contradicted by minimal objective findings during physical examinations from September 2009 through April 2013 as well as postoperative improvements. The conservative treatment she received, along with the efficacy of such conservative treatment, and her stable medication regimen further undermined her claims. The ALJ also explained that her treating physicians' treatment notes typically refuted the extreme conclusory opinions Conejo was "disabled", a decision reserved for the Commissioner. *See, e.g.*, AR 29 ("Dr. Novero noted after a few short visits that her seizures and headaches had decreased with mere medication, which was nothing more than routine, conservative care."); AR 549–52 (Novero's seizure questionnaire). Moreover, as the Decision points out, Dr. Kabins' April 29, 2013 medical source statement (AR 586–87) that concludes Conejo is "disabled permanently" based on the symptoms he describes beginning in September 2011, contradicts Conejo's claim of a July 20, 2010 alleged disability onset date.

The ALJ's findings were not undermined by Dr. Zucker's psychological evaluation. Zucker noted that Ms. Conejo's medical problems were "likely to interfere" with Conejo's ability to carry out various tasks on a sustained basis, "especially those that require physical exertion,"

and her performance appeared to be "more dependent on her physical problems." AR 389. Conejo asserts that Dr. Zucker's opinion is substantial evidence to support a disability finding as it is consistent with Dr. Kabins' opinion. However, Dr. Zucker is a psychologist who performed a psychological assessment. She did not examine or evaluate Conejo's physical condition, only her mental health condition, and its impact on her ability to work. The ALJ found that Dr. Zucker's statement was "directly refuted by the minimal treatment record for mental health, as well as the overall record." AR 25. In particular, the ALJ noted that Conejo's counseling notes reflected a "mere discussion of her marital stressors and/or physical concerns" and she had not treated for mental health conditions until six months *after* she filed her disability application. AR 25–26, 420. The ALJ provided legally sufficient reasons for questioning Conejo's motivation behind the minimal treatment.

The differences between Dr. Kabins' treatment notes and opinion were a major source of the "rampant inconsistencies" the ALJ found in the record. *See, e.g.*, AR 30 ("Dr. Kabins frequently repeatedly noted marked improvement in functioning following the surgeries he had performed."). Additionally, notes of other providers (*e.g.*, Dr. Housley in April 2010 and Dr. Novero in late 2012 and early 2013) after the second accident documented minimal spinal or other physical deficits. AR 28, 30.

Notably, Conejo relies on Dr. Kabins' opinion that she was disabled by pointing to a progress note referring to Conejo's statement about her failed attempt to return to work after the second surgery. *See* Mot. at 10 (citing AR 377). However, Dr. Kabins' May 11, 2011 treatment notes state that Conejo reported she had attempted to return to her laser work "and was completely incapable of doing such secondary to severe neck pain, discomfort and headaches." AR 377. The ALJ noted that Dr. Kabins deferred her return to work status to Dr. Siegler. AR 377, 487. Dr. Kabins own words were "Return to work status per Dr. Siegler." AR 377. Dr. Siegler's record of his May 16, 2011 appointment for a trigger point injection indicate Conejo was "having difficulty with her occupation as a hair removal specialist," which involved "quite a bit of repetitive neck motions, twisting, squatting, and turning of her head which is increasing her pain significantly." AR 476–77. He therefore recommended "against her continuing with these activities." AR 477.

Dr. Siegler did not recommend that Conejo not work at all. Two month later in July 2011, Ms. Conejo reported to Dr. Kabins that she was working three hours a day answering phones.

Based on numerous inconsistencies in the record, the ALJ reasonably concluded that portions of Dr. Kabins' medical source opinions were conclusory and unsupported. The court finds that the Decision states legally sufficient reasons for adopting portions of Drs. Kabins and Zucker's opinions while giving little weight to others. *See Magallanes*, 881 F.2d at 753.

The ALJ did not reject Ms. Conejo's subjective complaints of disabling pain and restrictions in their entirety. The ALJ gave Ms. Conejo the benefit of the doubt by restricting her to sedentary unskilled work with appropriate seizure restrictions. *See* AR 14–15, 29–31. The ALJ adopted Dr. Kabins' opinion that Conejo would be able to lift and/or carry ten pounds occasionally, and five pounds frequently. AR 27 (citing AR 586). Although the ALJ found that the remainder of Dr. Kabins' restrictions were disputed by his updated treatment notes, Conejo's RFC includes these lifting and carrying restrictions. *Id*. In addition, the ALJ adopted typical seizure restrictions based on Dr. Novero's opinion. AR 28 (citing AR 552). Her RFC was also consistent with the psychological opinions by Drs. Roldan and Zucker reporting that Conejo experienced only mild functional limitations based on her mental impairments. The record reflects the ALJ did not arbitrarily reject Conejo's subjective complaint testimony. The ALJ's adverse credibility determination was supported by specific, clear, and convincing reasons, and the Decision is supported by substantial evidence. *See Batson*, 359 F.3d at 1193.

Reviewing the record as a whole, the court finds that the ALJ did not err in his assessment that Ms. Conejo could perform sedentary unskilled work. The ALJ properly relied upon Medical Vocational Rule 201.28, which directed a finding that she was not disabled.

## CONCLUSION

Judicial review of a decision to deny disability benefits is limited to determining whether the decision is based on substantial evidence reviewing the administrative record as a whole. It is the ALJ's responsibility to make findings of fact, draw reasonable inferences from the record as a whole, and resolve conflicts in the evidence and differences of opinion. Having reviewed the Administrative Record as a whole, and weighing the evidence that supports and detracts from the

Commissioner's conclusion, the Court finds that the ALJ's decision is supported by substantial evidence under 42 U.S.C. § 405(g).

Accordingly,

**IT IS RECOMMENDED:**

1.  Plaintiff's Motion to Reverse/Remand (ECF No. 18) be DENIED.

2.  The Commissioner's Cross-Motion to Affirm (ECF No. 21) be GRANTED.

3.  The Clerk of Court be instructed to enter judgment accordingly and close this case.

Dated this 4th day of May, 2017.

PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE